IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOHN MEYER,

             Plaintiff,

      vs.                              Civil Action 2:07-CV-1253
                                       Magistrate Judge King

BARBARA McNICHOLAS, *et al.*,

             Defendants.


OPINION AND ORDER

With the consent of the parties, 28 U.S.C. § 636(c), this matter
is before the Court on *Defendant's Motion for Judgment Not
Withstanding the Verdict or, in the Alternative, a New Trial*, Doc. No.
66 ("*Defendant's Motion*").  For the reasons set forth below,
*Defendant's Motion* is **DENIED**.

I.    BACKGROUND

Plaintiff, formerly incarcerated in the Southeastern Correctional
Institution ["SCI"], alleges that defendant Barbara L. McNichols[1],
formerly a Corrections Sergeant at SCI[2], acted with deliberate
indifference to his safety in connection with a sexual assault by
another inmate in January 2006.  This matter was tried before a jury
on August 17, 2009 through August 19, 2009.  Doc. Nos. 56, 58, 59.

At trial, plaintiff testified that, at the time he was
incarcerated at SCI, he had been attempting to obtain custody of or

---

[1]The caption and pleadings mis-spell defendant's name.  *See Deposition
of Barbara L. McNichols,* p. 4, Doc. No. 27.

[2]Defendant has, since the events referred to in the *Complaint,* retired.
*Id.,* p. 10.

visitation rights with his son. *Excerpt of Transcript of Proceedings Direct Examination of John Meyer*, Doc. No. 66-1 ("*Plaintiff Excerpt*"), p. 10. While incarcerated, plaintiff was careful not to violate prison rules because he "would have lost custody of my son." *Id.* at 23.

Plaintiff also testified that he worked as a cook at SCI. *Id.* at 15-16. Four inmates in plaintiff's dorm pressured him to steal food for them. *Id.* at 22-23. Plaintiff refused their demands, *Id.* at 23, which led to punching and threats that increased in severity with time. *Id.* at 23-27. Plaintiff also witnessed these same inmates break into other inmates' locker boxes. *Id.* at 21-23, 25. The four inmates knew that plaintiff had seen them; they threatened to harm him if he reported the locker break-in. *Id.* at 21-22, 25-28.

These events alarmed plaintiff and, he testified, on January 11, 2006 he spoke with defendant, who was reported to be someone whom he could trust. *Id.* at 22, 28-29.

> Q:  Well, I came in, and I told her [defendant] what was happening, about the boxes being kicked, and I told her the threats that were made to me and about the punches. And she asked me if I wanted to check into P.C. [protective custody]. And I explained to her. That's why she told me they [the four inmates] would be in the hole.

*Id.* at 30.

> Q:  And she was able to figure out who these four guys were by their bed numbers?
>
> A:  Yes.
>
> Q:  And do you know what their names are?
>
> A:  Yes.
>
> Q:  And what were their names?

A: Morgan, Cubby, Cephus and Dunbar.

Q: Is Cubby a nickname?

A: Yes.

Q: You also told her that they threatened you?

A: Yes.

Q: Which threats did you report?

A: Cubby and Morgan. Cubby threatened to beat my brains in.

Q: And you said that you reported that they hit you?

A: Yes.

*Id*. at 31.

Q: Now, how did she ask you if you wanted to check into P.C.?

A: She asked me if I felt like I needed to-- for protective custody. And I asked her why. And she told me that I would have to refuse, failure to lock, and I would get a disciplinary action. Then I explained to her what was happening.

Q: What do you mean, what was happening?

A: With [custody of] my son, and I didn't want to get into trouble.

Q: So, what did you tell her about checking in?

A: I didn't want to.

Q: And what did she say she could do if you didn't check in?

A: She would put them in the hole for investigation.

Q: And did you know what that meant, being put in the hole for investigation?

A: I didn't know what "investigation" meant, but I know they would have been into the hole for a while.

Q: And you said she asked you about your schedule for the day?

```
A:    Yes.

Q:    And did you tell her your work schedule?

A:    Yes.

Q:    And what was the schedule for that day?

A:    12:00 to 6:30.

Q:    And what was she going to do while you were at work?

A:    She would have them in the hole before I got back from
      my job.

Q:    Did you believe her?

A:    Yes.

Q:    Why?

A:    Well, she wrote it down on her calendar on her desk,
      and I took her for her word.

Q:    Did she tell you anything else?

A:    No.

Q:    Did she offer you any opinion about what she thought
      about what was happening to you?

A:    She don't tolerate that.  That's one reason she would
      put them in the hole.
```

*Id*. at 32-33.

Defendant, however, testified at trial that she did not recall

speaking with plaintiff on January 11, 2006:

```
Q:    So, let's talk about John Meyer.  He met with you on
      the morning of January 11th, 2006, and said that
      several inmates had been hitting him, right?

A:    No, sir.

Q:    Well, let's do it this way: You would agree that if he
      said, Several inmates have been hitting me, that's a
      serious allegation, right?

A:    Yes, it would be.

Q:    Okay.  He also told you that these inmates were
```

breaking into locker boxes of other inmates' [sic] and stealing items; didn't he?

A:    I don't recall that, sir.

Q:    If he had said that, you would consider that to be a serious allegation as well, right?  I mean, stealing from people's locker boxes, that's serious, right?

A:    Yes.

Q:    Okay.  And he states that you told him to go to work and that the accused inmates would be out of the unit when he returned.  You are aware that that is his claim, right?

A:    That's his claim, you're saying.  I'm not aware of it, sir.

Q:    Well, you saw the lawsuit, right?  I mean, you saw the papers in the lawsuit, and that's what he said, right?

A:    Yes, sir.

Q:    Okay.  And, in fact, it was your practice to separate the reporting inmate from the accused inmate when you hear a serious threat, right?

A:    Yes, sir.

Q:    So, this claim-- we'll just take it a step at a time. This claim that you told him that the accused inmates would be gone is consistent with your practice, right?

A:    No, sir.  I would never tell one inmate what I was going to do, disciplinary or any other way, to another inmate, sir, for several reasons.

\*            \*            \*            \*

Q:    If you did offer him [plaintiff] an opportunity to check in on the morning of January 11th, that would be consistent with one of the techniques that you used when inmates came to you and said that they were threatened, right?

A:    Yes, sir.

*Excerpt of the Cross-Examination of Barbara McNichols*, Doc. No. 64, pp. 21-23 (*Defendant's Excerpt"*).

Defendant also testified that an inmate could "check in" for protection:

> Q:  Does SCI have a formal protective custody unit?
>
> A:  No, sir.
>
> Q:  But you did have something called "checking in," right?
>
> A:  Sir, checking in would be like if an inmate refused to live in that particular dorm, that particular bed area, for several particular reasons, not necessarily for protection.
>
> Q:  But it could be for protection, right?
>
> A:  Possibly.

*Id.* at 11.

> Q:  You offered the opportunity to check in to inmates from time to time, right?
>
> A:  Not necessarily.
>
> Q:  Did you ever do it?
>
> A:  Probably.
>
> Q:  Okay.  Now, what do you mean by "checking in"?
>
> A:  It wouldn't be that I would offer it to them.  I would ask them, Are you refusing to lock here?  Then I would ask for what reason.

*Id.* at 13.

> Q:  Well, I think you just said that one of the options open to inmates who felt fearful was to refuse to lock.  Isn't that correct?
>
> A:  That would be their option as they first came in to report something like that, not to the point that it was absolutely so.  They would not have to receive a conduct report to get taken out of the dorm, sir, temporarily.

*Id.* at 14.

Defendant also testified that she did not recall offering

plaintiff the opportunity to check into protective custody, nor did she recall advising plaintiff that he could be placed in security control[3] without violating a rule:

> Q: Okay. And, in fact, you did offer Mr. Meyer an opportunity to check in on the morning of January 11th, 2006, after he reported to you that he was fearful, right?
>
> A: I don't remember him ever telling me he was fearful of anything, sir.
>
> Q: You offered him an opportunity to check in on the morning of January 11th, 2006, didn't you?
>
> A: Not that I recall, sir.
>
> Q: Are you denying it, or just saying that, today, you don't remember?
>
> A: I'm saying, if I had have [sic] did that, there would be paperwork everywhere to that matter. I cannot just, as a hearing sergeant or counselor sergeant in the unit, personally walk him out and put him somewhere without doing the proper chain of paperwork, sir. And I do not recall placing him anywhere, or even a bed move, at that time.
>
> Q: And my question wasn't whether you accomplished this. My question is whether you offered it.
>
> John, you want a chance to check in? You seem to be frightened.
>
> It's January 11th. It's the morning. You're meeting with him in your office. Did you offer it to him?
>
> A: Not that I recall, sir.

*Id.* at 23-24.

> Q: So, your position is that you don't know if this-- if Mr. Meyer-- as far as you're concerned, your position is that you don't know if Mr. Meyer came to you or didn't come to you, right?

---

[3]It is not immediately clear what specific distinction, if any, there is between protective custody and security control. However, both are apparently areas separate from the rest of the inmate population.

A:    Prior to any of this [a sexual assault on plaintiff]
              allegedly happening?

        Q:    Right, prior to the attack on the--

        A:    No, sir, I do not believe that he did.

*Id.* at 29-30.

        Q:    And I just need to get this straight.  It seems like
              you're saying you don't remember.  Is that what you're
              saying?

        A:    I'm saying, sir, to the best of my knowledge, Mr.
              Meyer never, ever, came to me with any prior warning
              of anything going to take place.

        Q:    Okay.  So, does that mean it didn't happen?

        A:    To the best of my knowledge, it never, ever happened.

*Id.* at 31.

        Q:    Did you ever advise Mr. Meyer that he could be placed
              in security control and not have to submit to a
              ticket?

        A:    Not to my knowledge.

*Id.* at 34-35.

        Plaintiff testified that, when he returned to his dorm around

6:30 or 7:00 p.m. on January 11, 2006, all four of the inmates whom he

had identified to defendant that morning remained in the dorm.

*Plaintiff's Excerpt*, p. 34.  These inmates called a fifth inmate,

"Doughboy," who sexually assaulted plaintiff.  *Id.* at 39-41.

Plaintiff testified that the incident ended when corrections officers

came to the dorm.  *Id.* at 41.  Plaintiff reported the incident and was

escorted to the infirmary, where he remained for three days.  *Id.* at

42-44.

        At the close of plaintiff's case in chief on August 18, 2009,

defendant moved for judgment as a matter of law, which the Court

denied. Doc. No. 58. On August 19, 2009, the jury returned a verdict in favor of plaintiff, awarding $10,000 in compensatory damages and $30,000 in punitive damages. Doc. Nos. 60, 61, 62. *Defendant's Motion* addresses that verdict.

## II. STANDARD

Defendant moves for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). That rule provides, in pertinent part, that following the denial of a motion for judgment as a matter of law under Rule 50(a), the movant may, within 28 days after the entry of judgment, file a renewed motion for judgment as a matter of law. The court may "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b). In considering a Rule 50 motion for judgment as a matter of law, a court should review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). In doing so, the court may not make credibility determinations or weigh the evidence. *Id.* "A court may grant judgment as a matter of law 'only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party[.]'" *Lowery v. Jefferson County Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009) (quoting *Pouillon v. City of Owosso*, 206 F.3d 711, 719 (6th Cir. 2000)).

Defendant moves alternatively for a new trial pursuant to Fed. R. Civ. P. 59(a)(1)(A). Rule 59(a)(1)(A) provides that a court, upon motion, may grant a new trial on all or some issues "after a jury trial, for any reason for which a new trial has heretofore been

granted in an action at law in federal court[.]" A new trial under this rule is warranted

> when a jury has reached a "seriously erroneous result" as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias.

*Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996).

## III. DISCUSSION

In moving for judgment as a matter of law or, in the alternative, for a new trial, defendant argues that no reasonable juror could have found that (1) defendant was deliberately indifferent to plaintiff's safety; or (2) plaintiff is entitled to an award of punitive damages. The Court will address each argument in turn.

### A. Deliberate Indifference

A prison official may be held liable under the Eighth and Fourteenth Amendments for acting with "deliberate indifference" to an inmate's safety if she knows that the inmate faces a substantial risk of serious harm and yet disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825 (1994). *See also Greene v. Bowles,* 361 F.3d 290, 294 (6th Cir. 2004). It is subjective recklessness, not obviousness, constructive notice or negligence, that constitutes the appropriate test for "deliberate indifference." *Farmer,* 511 U.S. at 835.

Turning to the instant case, defendant argues that plaintiff was required to establish that (1) defendant was aware of the fact that he was in substantial danger of assault by other inmates; and (2) defendant was "indifferent" to that danger. *Defendant's Motion*, p. 4. Defendant contends that plaintiff "failed to demonstrate that

McNichols took no steps to protect him," pointing to plaintiff's testimony that defendant offered him protective custody, which plaintiff refused. *Id*. at 2, 5. Defendant further argues that the testimony of both plaintiff and defendant established that "no conduct report was necessary in order for an inmate to go to protective custody." *Id*. Defendant contends that it is insufficient that (1) plaintiff erroneously believed that his consent to enter protective custody would entail a disciplinary matter; or that (2) defendant ultimately failed to protect plaintiff from the attack. *Id*. at 5-6.

Plaintiff, however, contends that he was not required to show total inaction by defendant; rather, he must show only that defendant's response to the known risk was not reasonable. *Plaintiff's Memorandum in Opposition to Defendant's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, a New Trial (Doc. 66)*, Doc. No. 68, p. 4 ("*Memo. in Opp.*"). Plaintiff argues that he asked to be separated from the abusive inmates and relied on defendant's promise that she would remove those inmates from their common housing unit. *Id*. at 6. Plaintiff contends that it was unreasonable for defendant to assure plaintiff, after he declined to check in, that she would remove the abusive inmates and then not do so. *Id*.

The Court concludes that there is sufficient evidence in the record to support the jury's verdict of deliberate indifference on the part of defendant. As set forth in the trial testimony *supra*, plaintiff testified that he spoke with defendant on the morning of the attack and that she assured him that the four inmates would be removed from the dorm. The jury clearly credited this testimony; it cannot be

11

said that there was "a complete absence of fact to support the verdict" so that no reasonable juror could have found in favor of plaintiff on this issue. *See Lowery*, 586 F.3d at 432; *Farmer,* 511 U.S. at 835. To conclude otherwise would require this Court to disregard plaintiff's testimony and accept defendant's version of the facts -- a credibility determination prohibited to this Court. *Id*. *See also Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 258 (6th Cir. 2000). Similarly, the Court cannot conclude that the jury's verdict was against the weight of the evidence. *See Holmes*, 78 F.3d at 1045-46. Accordingly, as it relates to the jury's finding of deliberate indifference, *Defendant's Motion* is **DENIED**.

   **B.    Punitive Damages**

   Defendant also argues that the award of punitive damages was improper because there was no evidence of ill will, spite, or grudge between the parties. *Defendant's Motion*, pp. 6-7. Defendant argues that plaintiff testified that he spoke to defendant because she was someone whom he knew could be trusted and because she had a reputation for honesty and trustworthiness. *Id*. at 7; *Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Judgment Not Withstanding the Verdict or, in the Alternative*, *a New Trial*, Doc. No. 70, p. 3 ("*Reply*"). Defendant also notes that even plaintiff admitted that defendant offered him protective custody, that the parties had no relationship prior to January 11, 2006, and that defendant testified that she did not remember plaintiff. *Id*. Defendant further argues that there was no evidence supporting a finding that defendant acted wantonly or oppressively:

> ... [S]everal jurors told the Court and counsel
> that they felt Defendant was simply negligent.
> With respective [sic] to their award of punitive
> damages, several jurors told the Court and
> counsel that they merely intended to send a
> message to the [non-party] Ohio Department of
> Rehabilitation and Correction.

*Defendant's Motion*, p. 7 n.2.

In response, plaintiff contends that, while a finding of deliberate indifference does not require an award of punitive damages, the two standards are "consistent" and much of the same evidence bears on both findings. *Memo. in Opp.*, p. 7 (citing *Hill v. Marshall*, 962 F.2d 1209, 1216 (6th Cir. 1992); *Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008)). Plaintiff further argues that defendant's reliance on juror comments following the trial is improper because jurors may not impeach their own verdict. *Id*.

As an initial matter, the Court agrees that defendant cannot rely on juror remarks following the trial to support her argument that the award of punitive damages was unwarranted. *See*, *e.g.*, *United States v. Kelley*, 461 F.3d 817, 831 (6th Cir. 2006) ("Under Rule 606(b), any evidence regarding a juror's thoughts about the trial, if offered to impeach the jury's verdict, is incompetent and cannot be admitted."); *United States v. Gonzales*, 227 F.3d 520, 523 (6th Cir. 2000) ("The Supreme Court has long adhered to the general rule that a juror is incompetent to impeach his or her verdict.").[4] "Post-trial jury scrutiny is disfavored because of its potential to undermine 'full and

---

[4]It is true that there are two exceptions to this rule: *i.e.,* when extraneous prejudicial information is improperly brought to the jury's attention and when outside influence is applied to a juror. *Kelley*, 461 F.3d at 831. However, plaintiff has not established -- or even asserted -- that either of these exceptions apply in this case.

frank discussion in the jury room, jurors' willingness to return an
unpopular verdict, and the community's trust in a system that relies
on the decisions of laypeople.'" *Kelley*, 461 F.3d at 831 (quoting
*Tanner v. United States*, 483 U.S. 107, 120-21 (1987)).  Accordingly,
defendant's reliance on post-trial jury comments in order to attack
the award of punitive damages in this case is improper and
unpersuasive.

    Although the United States Court of Appeals for the Sixth Circuit
has not held that a finding of deliberate indifference mandates an
award of punitive damages, "it remains true that the two standards are
'consistent,' . . . and that much of the evidence bearing on one
question bears on the other." *Gibson*, 523 F.3d at 664 (internal
citations omitted).  *See also Hill v. Marshall*, 962 F.2d 1209, 1217
(6th Cir. 1992) (stating that other courts of appeals "have held that
the state of mind that meets the standard of deliberate indifference
is sufficient to meet the standard for punitive damages" and finding
that the conduct of defendant in that case could support a verdict for
punitive damages).  Therefore, once a finding of deliberate
indifference has been made, it is difficult to argue that there is "no
evidence" to support an award of punitive damages.  *Gibson*, 523 F.3d
at 664  (citing *Farmer*, 511 U.S. at 839).

    Here, no party objected to the fact that the jury was instructed
on punitive damages.[5]  The Court's instruction read, in pertinent part:

        If you find from a preponderance of the evidence that
        the plaintiff is entitled to a verdict for compensatory
        damages, and you further find that the acts of the defendant

_____

        [5]Indeed, defendant did not object to any of the Court's proposed
instructions during the charge conference on August 19, 2009.

were maliciously, or wantonly, or oppressively done, then you may add to the award of compensatory damages such amount as you shall unanimously agree to be proper, as punitive damages.

An act is "maliciously" done, if prompted or accompanied by ill will, or spite, or grudge, either toward the injured person individually, or toward all persons in one or more groups or categories of which the injured person is a member.

An act is "wantonly" done, if done in reckless or callous disregard of, or indifference to, the rights of one or more persons, including the injured person.

An act is "oppressively" done, if done in a way or manner that injures, or damages, or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of another person.

Defendant focuses only on the first portion of this instruction, *i.e.,* malicious acts, in arguing that an award of punitive damages was not supported by the evidence. She specifically contends that the evidence establishes that she did not act with ill will, spite or grudge. *Defendant's Motion*, p. 6-7. However, and even assuming without deciding that defendant is correct that there is no evidence that she acted maliciously, defendant fails to fully address the other two portions of this instruction, *i.e.,* wanton acts and oppressive acts. Instead, defendant simply asserts in conclusory fashion that there is no evidence that she acted wantonly or oppressively. *Id.* at 7; *Reply*, p. 3. However, as discussed *supra*, deliberate indifference involves reckless disregard, *Farmer,* 511 U.S. at 835, a concept that also describes wantoness sufficient to justify an award of punitive damages. It appears that the jury credited plaintiff's testimony that defendant assured him that the four inmates would be removed from the unit by the time plaintiff returned from his work assignment. It is

15

undisputed that, when plaintiff returned to his dorm, the four inmates were still there and were in a position to attack plaintiff.  Simply put, this case presents evidence that defendant acted wantonly, or in reckless disregard of, or indifference to, plaintiff's rights under the Eighth and Fourteenth Amendments.  It follows that this case presents evidence that supports the jury's award of punitive damages.[6]

Defendant's reliance on *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003), does not militate a different result.  Specifically, defendant argues that an award of punitive damages must be coextensive with reprehensible conduct.  *Defendant's Motion*, p. 6.  However, the *Campbell* analysis goes to a different inquiry.  As is evident from defendant's own citations to the case, *Campbell* addresses the "*reasonableness* of a punitive damages award[,]" *i.e.*, the *amount* of the award, not whether an award in any amount was supported by the evidence.  *Campbell*, 538 U.S. at 419 (emphasis added) (considering whether an award of $ 145 million in punitive damages, where full compensatory damages amounted to only $ 1 million, is excessive and in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States).  In *Gibson*, 523 F.3d at 664, the Sixth Circuit teaches that a court must first consider whether the evidence supports any punitive damages award and, if it does, only then should the court determine whether or not the award was excessive, considering, *inter alia*, the reprehensibility of

---

[6]Defendant attempts to distinguish *Hill* by arguing that the defendant in *Hill* took no action, whereas she offered plaintiff protective custody.  *Reply*, p. 3.  For the reasons discussed *supra*, namely that a jury could find, and apparently did find, that defendant failed to fulfill her promise to remove the four inmates, defendant's argument is unpersuasive.

the defendant's conduct. *Id.* Here, defendant challenges only the fact of the punitive damages award and does not argue that the award was excessive. *Defendant's Motion*, p. 6 ("The award of punitive damages in this case was *not supported by the evidence introduced at trial[.]*"). Accordingly, *Campbell* and the reprehensibility of defendant's conduct is inapposite to defendant's argument.

**WHEREUPON**, *Defendant's Motion for Judgment Not Withstanding the Verdict or, in the Alternative, a New Trial*, Doc. No. 66, is **DENIED**.


January 25, 2010 _____s/Norah McCann King_____
Norah M<sup>c</sup>Cann King
United States Magistrate Judge

17